STATE OF LOUISIANA      *      NO. 2023-K-0210

VERSUS      *

       **COURT OF APPEAL**

MONTREAL DAVIS      *

       **FOURTH CIRCUIT**

     *

       **STATE OF LOUISIANA**

* * * * * * *

APPLICATION FOR WRITS DIRECTED TO
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 554-321, SECTION "B"
Honorable Tracey Flemings-Davillier, Judge
* * * * * *
**Judge Karen K. Herman**
* * * * * *

(Court composed of Judge Paula A. Brown, Judge Rachael D. Johnson, Judge Karen K. Herman)

Jason R. Williams
District Attorney
Brad Scott
Assistant District Attorney
Chief of Appeals
Mithun B. Kamath
Assistant District Attorney
Parish of Orleans
619 South White St.
New Orleans, LA 70119

     COUNSEL FOR STATE OF LOUISIANA

Drew Lafontant
Orleans Public Defenders
2601 Tulane Avenue, Suite 700
New Orleans, LA 70119

     COUNSEL FOR DEFENDANT/RELATOR

       **WRIT GRANTED; REVERSED AND REMANDED**
       **May 31, 2023**

Defendant-Relator, Montreal Davis, seeks review of the trial court's February 28, 2023 ruling which denied his motion to suppress. We grant the writ application, reverse the trial court's ruling on the motion to suppress, and remand the matter for further proceedings.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

The state filed a bill of information on May 16, 2022, charging the defendant, Montreal Davis ("defendant"), with one count of possession of a firearm by a felon, a violation of La. R.S. 14:95.1.  The defendant appeared for arraignment on July 18, 2022, and entered a plea of not guilty. On August 1, 2022, the defendant filed an *omnibus* motion seeking discovery, the preservation of evidence, a preliminary examination, and the suppression of evidence, statements and identifications procedures, where applicable.[1]

---

[1] It is a common practice in the Criminal District Court for Orleans Parish for defense counsel to file *omnibus* motions at the very inception of the prosecution in order to expedite the proceedings. In many cases, these motions are filed even before the prosecution has provided police reports and other file contents that would acquaint the defendant with the facts on which the prosecution is based.

The defendant's motions were heard on February 28, 2023. There is no indication in the record that the state filed any responses to the defendant's motions in the seven-month interval between the filing of the motions by the defendant and the hearing, whether an objection to form or a response on the merits. After taking testimony on the motion to suppress evidence and the preliminary hearing, the trial court denied the defendant's motion to suppress and found probable cause for a violation of R.S. 14:95.1. The defendant objected to the trial court's ruling, and noticed his intent to file a writ. The court set a return date of March 30, 2023, on which date the defendant timely filed the instant writ application.

On April 3, 2023, this Court ordered the defendant to supplement his writ application with the motion to suppress; ordered the state to file a response to the instant writ application by April 17, 2023; and ordered the trial court to file a *per curiam* regarding its February 28, 2023 ruling denying the motion to suppress by April 17, 2023. The defendant supplemented his writ application with his motion to suppress evidence on April 10, 2023; the trial court filed its *per curiam* on April 12, 2023; and the state filed its response on April 13, 2023.

The state called New Orleans Police Department Officer Alexandra Paciullo ("Officer Paciullo") as its only witness on the motion to suppress and the preliminary hearing. She testified that she was dispatched to the defendant's residence on February 1, 2022 to investigate "a domestic disturbance called in by [the defendant's] fiancé at the time." During her interview of the defendant regarding the domestic disturbance, the defendant asked her if he could retrieve his

2

cigarettes from inside the residence, leading Officer Paciullo to ask, for purposes of officer safety, if there were any firearms present in the home. The defendant responded that there was a firearm in the dresser in the bedroom he and his fiancé shared. Officer Paciullo testified that it appeared that the defendant lived at that residence as upon her entry, she observed personal items "that seemed were [the defendant's]" when she entered. She stated that she conducted a "criminal history check" and discovered that the defendant "was a convicted felon for second degree battery in 2013."

On cross-examination, Officer Paciullo agreed that "the dispatch was not for a domestic abuse battery…there was no allegation of aggravated assault… [and] no mentions of any firearms." She recalled that she did not arrest the defendant "for anything related to the domestic disturbance." She explained that when she arrived at the residence, the defendant and his fiancé were standing outside on the front porch. She and the other officers interviewed the defendant and his fiancé separately. The defendant explained that he had "gotten into a verbal argument" with his fiancé, and that he would be willing to relocate for the evening. Defense counsel had Officer Paciullo clarify that when asked about any firearms in the house, the defendant said that his fiancé had a gun, and that the defendant had to speak to his fiancé to determine its exact location.

While asking about the retrieval of the defendant's cigarettes, Officer Paciullo indicated a lack of memory, whereupon defense counsel had Officer

3

Paciullo refresh her recollection by viewing the recording from the bodycam she wore that night. [2]

The record reflects that a 51 second portion of the video was played and Officer Paciullo indicated that her recollection had been refreshed. She then conceded that the defendant's exact words to his fiancé regarding the location of the gun were "where's the gun in the drawer?" Officer Paciullo testified that she then asked the defendant where his cigarettes were located, and she entered the residence to retrieve them, "and exited right away." She stated that she did not observe any weapons or contraband in plain view while she was in the residence.

Officer Paciullo testified that another officer conducted a criminal history search and discovered a "misdemeanor warrant" for the defendant's arrest, whereupon he was secured in handcuffs. In the search incident to his arrest, no weapon or contraband was found and the defendant was placed in the backseat of the police vehicle. Officer Paciullo testified that she then re-entered the residence and walked through the living room and two bedrooms, and then seized the firearm from the top dresser drawer located in the second bedroom. She admitted that neither the defendant nor his fiancé had given her permission to enter the residence a second time. Officer Paciullo also stated that the defendant's fiancé claimed ownership of the firearm and denied that any other weapons were located inside the home.

When asked about further investigation, Officer Paciullo stated that she did not ask the defendant's fiancé whether the defendant had ever used or held the gun, nor did she test the gun for DNA or fingerprints, nor did she ask whether anyone

_____

[2] As will be discussed below, apparently the bodycam recording was displayed in such a manner that it was visible to the trial court. The recording was not offered into evidence by either party.

else lived at the residence. She also said that she could have applied for a search warrant "via CloudGavel," but "chose not to."

On redirect examination, Officer Paciullo testified that she had asked for, and received, the defendant's permission to enter the residence to retrieve his cigarettes, and clarified that she had not re-entered the home to seize the firearm until after she learned that the defendant was a convicted felon. She also stated that the domestic disturbance claim was "nonviolent in nature," although she could not recall the specific allegations.

The trial court heard oral argument prior to ruling on the motion to suppress and preliminary hearing. Counsel for the defendant argued first and contended that the motion to suppress should be granted and the gun excluded because the police had no search warrant and none of the exceptions to the warrant requirement applied.[3] In its rebuttal, the state mentioned that the defendant had given consent to enter the house for purposes of retrieving his cigarettes, but did not explain how that justified the search. The state also contended that the inevitable discovery doctrine applied to these facts such that the motion to suppress should be denied. The trial court denied the motion and found probable cause for a violation of R.S. 14:95.1.

**THE TRIAL COURT'S *PER CURIAM***

Because the trial court simply denied the motion to suppress evidence without elaboration, this Court ordered that it provide a *per curiam*. The trial court complied and furnished an eight-page judgment expressing its view of the facts and the rationale for its ruling. The trial court summarized the facts as follows:

---

[3] Defense counsel also argued that the state had not established that the defendant had either actual or constructive possession of the gun, and that the trial court should also conclude that there was no probable cause for the arrest on the charge of R.S. 14:95.1.

# I.     STATEMENT OF THE CASE

During the February 28, 2023 hearing, Officer Alexandra Paciullo testified about the circumstances surrounding the arrest. Specifically, according to Officer Paciullo, she and another officer responded to a call via dispatch by Mr. Montreal Davis' fiance, Brittany Domino, regarding a domestic disturbance, and upon arrival found Mr. Davis and Ms. Domino at the residence. Officer Paciullo stated that she spoke to Mr. Davis about the disturbance, at which point he requested to go inside to grab his cigarettes. Before allowing him to enter the residence, for purposes of officer safety, Officer Paciullo asked Mr. Davis if she could come with him and whether there was a firearm in the house. Mr. Davis advised that the house was his fiance's house and that there was a firearm in the house. Upon being asked where the firearm was located, Mr. Davis asked Ms. Domino where the: firearm was located and if it was in the drawer. She in turn indicated that it was in the dresser drawer in the bedroom. The Officer then asked Mr. Davis if she could retrieve his cigarettes for him. Mr. Davis pointed inside the house and said "they're right there." On cross examination. Officer Paciullo was unable to recall the exact point at which she entered the house, so Defense Counsel played a portion of Officer Paciullo's body camera video from the night of the incident to refresh her memory. Officer Paciullo's body camera shows that she then walked through the front two rooms of the shotgun style house and retrieved the cigarettes from a table just inside the third room.

The body camera shows that after she retrieved the cigarettes and verified that Mr. Davis lived in the residence, Officer Paciullo further discussed the domestic dispute with Ms. Domino, who asked the Officer to get her phone from the front room of the house so that she could call her brother to arrange to stay with him. Following her conversation with Ms. Domino, Officer Paciullo returned to speak to Mr. Davis, asking him if he would also leave the property and advising that they would both be free to go after the officers complete their paperwork because Ms. Domino indicated that they just needed some space. Another officer then approached Mr. Davis and placed him in handcuffs informing him that he had an active warrant for his arrest. Based on the officer's body camera Mr. Davis said he just completed parole for a conviction of a felon in possession of a firearm. According to the testimony, after the officers secured Mr. Davis in handcuffs and placed him in the back of the police cruiser, they entered the home a second time. The body camera shows that following Mr. Davis' arrest, Officer Paciullo left the other officers, reentered the house and asked Ms. Domino where the firearm was located and whether they could retrieve it, and Ms. Domino responds in the affirmative. Ms. Domino then shows the officers where the firearm is located, and when asked about taking the firearm, Ms. Domino advised that the officers could take the firearm. Officer Paciullo retrieved the firearm from the open top drawer of the dresser, which was located against the wall across from the bed. Officer

Paciullo removed the magazine from the firearm. The officers told Ms. Domino that they had to take the firearm outside, and Ms. Domino responded that she had no issue with the officers taking her firearm. Following the Officer's testimony, the State offered the certified conviction packet of Mr. Davis, evidencing that Mr. Davis had a previous conviction for Second Degree Battery.

The trial court then proceeded to discuss the current Fourth Circuit jurisprudence on constructive possession and consent searches. The *per curiam* concluded with the trial court's reasoning that proper consent had been obtained by Officer Paciullo to justify the retrieval of the weapon, and that the state established probable cause for the constructive possession of the gun by the defendant.

**DISCUSSION**

A "district court's findings of fact on a motion to suppress are reviewed under a clearly erroneous standard and the district court's ultimate determination of Fourth Amendment reasonableness is reviewed de novo." *State v. Anderson*, 2006-1031, p. 2 (La. App. 4 Cir. 1/17/07), 949 So. 2d 544, 546 (quoting *State v. Pham*, 2001-2199, p. 3 (La. App. 4 Cir. 1/22/03), 839 So.2d 214, 218.) "Accordingly, on mixed questions of law and fact, the appellate court reviews the underlying facts on an abuse of discretion standard, but reviews conclusions to be drawn from those facts de novo." *Id*.

Problematic with the trial court's *per curiam* in the instant case, is that it appears to be based almost entirely on facts not in evidence. Throughout the trial court's analysis, it references the police-worn body camera footage used to refresh Officer Paciullo's memory while testifying at the hearing on the defendant's motion to suppress, which was not introduced into evidence at any time.

This Court noted in *Talamo v. Shad*, 619 So.2d 699, 701 (La. App. 4 Cir. 1993) that writings or recordings used to refresh a witness's memory while testifying at trial are not automatically introduced as evidence into the record.

7

La. C.E. art. 612 allows a witness to use any writing [or recording] to refresh his memory while testifying. However, Authors' Note (1) to C.E. art. 612 states:

> When the witness has been permitted to consult the source, a writing, for example, and it has not refreshed his memory to the extent that he now has an independent recollection of the event in question, [C.E. art. 612] does not authorize the witness to read the writing into evidence, nor does it authorize the introduction of the writing, itself.... The purpose of [C.E. art. 612] is to give a witness an opportunity to jog his memory so that he may testify from memory.

*See also State v. Runnels*, 2012-167, p. 12 (La. App. 3 Cir. 11/7/12), 101 So.3d 1046, 1055-56; *State v. Johnson*, 2001-0842, p. 12 (La. App. 5 Cir. 2/13/02), 812 So.2d 106, 115 ("when a writing is used to refresh a witness' memory, it is the testimony and not the writing which is the evidence.")

In the *per curiam*, the trial court explains that it denied the defendant's motion to suppress based on its factual finding that the officers were given consent to enter the house and retrieve the firearm; however this is not supported by the evidence that is in the record. This is illustrated by the following exchange between Officer Paciullo and defense counsel on cross-examination:

> Q. After Mr. Davis was handcuffed and placed in the back of a squad car, you entered the house another time?
> A. Yes.
> Q. And Mr. Davis did not give you permission to enter the house that time?
> A. No.
> Q. And Ms. Domino did not give you permission to enter the house that time?
> A. I don't recall that.
> Q. Would it refresh your recollection to watch your body cam?
> A. Sure.

Following her review of the video, Officer Paciullo's testimony continued:

> Q. Is your memory refreshed?
> A. Yes, ma'am.

Q. So when you entered the residence the second time, you did not get permission from Mr. Davis?
A. Correct.
Q. And you did not get permission from Ms. Domino?
A. Correct.
Q. So you just walked in through the door?
A. Yes.
Q. And you walked through the living room?
A. Yes.
Q. And you walked into the first bedroom?
A. Yes.
Q. And you told Ms. Domino that you had to ask her about her gun?
A. Yes.
Q. And Ms. Domino told you that the gun was in her bedroom?
A. Yes.
Q. And Ms. Domino told you that the gun was hers?
A. Yes.
Q. Ms. Domino told you that there were no other firearms in the house?
A. Yes.
Q. And you recovered the gun from the dresser in the second bedroom; is that right?
A. Yes.

"It is well established that an appellate court may not consider evidence which is outside the record." *State v. Bentley*, 2012-1106, p. 6 (La. App. 4 Cir. 5/15/13), 116 So.3d 891, 895 (citing *State v. Johnson*, 09-0259, p. 10 (La. App. 4 Cir. 9/16/09), 22 So.3d 205, 212.) In this case, because the trial court's ruling relied on evidence that was not introduced at the hearing, and this Court cannot consider evidence that is not included in the record, it does not appear that the trial court's ruling is supported by the facts contained in the record before this Court. Accordingly, a *de novo* review follows.

In argument following the hearing and in his writ application, the defendant asserts that the trial court erred in denying his motion to suppress the firearm recovered from the defendant's residence because it was unconstitutionally seized. Specifically, the defendant contends that Officer Paciullo entered his residence and conducted a search without a warrant, and without consent from either the

9

defendant or his fiancé, and that no exception to the warrant requirement is applicable in these circumstances. Therefore, the defendant argues the evidence should be excluded.

In its response to the defendant's writ application, the state first asserts that the defendant filed only a general motion to suppress evidence contained in an *omnibus* motion, which consisted entirely of boilerplate language, and failed to allege specific facts that would require the granting of relief in this case. Thus, the state argues, the defendant's pleading was insufficient and a hearing should never have been held to determine the issue, and the trial court did not err in denying the motion on those grounds.

At the outset, it does not appear that the trial court even considered the factual allegations (or lack thereof) contained in the defendant's motion to suppress evidence. In any event, La. C.Cr.P. art. 703(A) provides that any "defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained." La. C.Cr.P. Art. 703(D) and (E) further provide pertinently:

> D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.
>
> E. (1) An evidentiary hearing on a motion to suppress shall be held only when the defendant alleges facts that would require the granting of relief. The state may file an answer to the motion.

As observed earlier, the argument in its opposition to the writ application is the first instance the state has complained about the sufficiency of the allegations

in the motion to suppress. Approximately seven months elapsed between the filing of the motion to suppress and the hearing on that motion. No written objection to the sufficiency of the defendant's motion was placed in the record, nor was an answer to the motion filed. Likewise, at the hearing on February 28, 2023, the assistant district attorney representing the state said nothing about a lack of factual allegations in the motion; she simply called Officer Paciullo to the witness stand. Regardless of the facts alleged (or not) in the defendant's motion, he was able to show at the motion hearing that the police entered the residence and seized the firearm in this case without a warrant. Thus, it was the state's burden to prove the admissibility of the evidence seized without a warrant. The state failed to carry that burden.

The Fourth Amendment prohibits unreasonable searches and seizures and protects both houses and effects. U.S. Const. Amend. IV. Similarly, the Louisiana Constitution Article 1, § 5 provides pertinently:

> Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search.

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). "The 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,' and accordingly, warrantless entries are considered presumptively unreasonable." *State v. Warren*, 2005-2248, p. 11 (La. 2/22/07), 949 So.2d 1215, 1225, (quoting *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir. 1995)). While exceptions to the warrant requirement apply

11

in some circumstances, the United States Supreme Court has held that, "in the absence of consent or exigent circumstances…the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." *Steagald v. United States*, 451 U.S. 204, 211, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981).

For example, "[p]olice generally need a warrant to enter a home, but 'warrantless searches will be allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant.'" *Warren*, 2005-2248, p. 9, 949 So.2d at 1224 (quoting *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir.2003)). *See also Kentucky v. King*, 563 U.S. 452, 131 S.Ct. 1849, 1852, 179 L.Ed.2d 865 (2011) (The presumption of unreasonableness of a warrantless search and seizure may be overcome when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.").[4] A warrantless search incident to a valid arrest may also be conducted on the person of, and an area only within the immediate control of the arrestee. *State v. Anthony*, 98-0406, pp. 19-20 (La. 4/11/00), 776 So.2d 376, 389, (citing *Chimel v. California*, 395 U.S. 752, 768; 89 S.Ct. 2034, 2043, 23 L.Ed.2d 685 (1969)).

In this case, the state did not assert admissibility of the firearm based on either of these exceptions to the warrant requirement, nor does it appear that either exception applies. First, the circumstances were not so exigent that the officers had no time to apply for a warrant. Officer Paciullo testified that the defendant was

---

[4] The exigent circumstances exception "encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002).

secured in handcuffs in the backseat of the police vehicle, his fiancé was outside with the officers, and nobody else was present at the scene when she made the warrantless entry into the residence. She also testified that she could have applied for a warrant through CloudGavel if she had so chosen, but did not explain why she declined. Secondly, the defendant was outside of the residence when he was arrested, thus any area within his immediate control would not have included any of the rooms inside the house, and certainly not his fiancé's dresser drawer.

"Consent is [also] a well-recognized exception to the warrant requirement." *State v. Strange*, 2004-0273, p. 6 (La. 5/14/04), 876 So.2d 39, 42 (citing *State v. Owen*, 453 So.2d 1202, 1206 (La.1984)). As discussed above, the trial court found that the officers received consent to enter the residence, conduct the search, and seize the firearm, albeit based on facts not introduced into evidence. However, the state also appears to argue that the defendant's acquiescence to Officer Paciullo's entry into the residence for the sole purpose of retrieving his cigarettes constituted consent to a subsequent warrantless entry into the residence, and consent to a search of his fiancé's dresser drawer.

During argument at the motions hearing, it stated to the trial court, "[a]s far as the warrantless entry into the home, officers did have permission to go into the home to retrieve his cigarettes." The state also asserts in its writ response that the defendant consented to Officer Paciullo's entry into the house to get his cigarettes and never revoked or withdrew his consent, thus any subsequent entry and search would have been authorized, citing *State v. Johnson*, 08-268, p. 9 (La. App. 5 Cir. 10/28/08), 996 So.2d 1151, 1156 ("Once voluntary consent to search is given, it continues until it is revoked or withdrawn."). The state also asserts that "the typical reasonable person would have understood the exchange between [defendant] and

Officer Paciullo to entail a wide scope of consent, especially after the officers unearthed [defendant]'s criminal history." These arguments are unavailing.

For a search to be constitutional based on consent, the consent must have been "voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2028, 2059 (1973). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792 (1968). "[T]he scope of a suspect's consent under the Fourth Amendment is measured under a standard of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803-04, 114 L.Ed.2d 297 (1991) (citing *Illinois v. Rodriguez,* 497 U.S. 177*,* 183-189, 110 S.Ct. 2793, 2798-2802, 111 L.Ed.2d 148 (1990)).

The scope of a search is generally defined by its expressed object. *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The Fourth Amendment expressly provides that no warrant may issue except those "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. *See also* La. C.Cr.P. art. 162(C).

> When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization. Consent to search a garage would not implicitly authorize a search of an adjoining house; a warrant to search for a stolen refrigerator would not authorize the opening of desk drawers. Because "indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment," *Payton v. New York*, 445 U.S. 573,

14

583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639, that Amendment requires that the scope of every authorized search be particularly described.

*Walter v. United States*, 447 U.S. 649, 656-57, 100 S.Ct. 2395, 2401-02, 65 L.Ed.2d 410 (1980).

In the instant case, as the defendant asserts in his writ application, the defendant authorized Officer Paciullo's entry into the residence for the limited purpose of retrieving his cigarettes from a specific location. Thus, the defendant's "consent" to enter particularly described the location of the object he sought "seized," and the scope of his authorization did not extend beyond that, notwithstanding the state's argument that the defendant never revoked or withdrew his consent. Once Officer Paciullo went outside and brought the defendant his cigarettes, Officer Paciullo was no longer authorized to enter the residence, and any subsequent entry into the residence, especially a search of the defendant's fiancé's dresser drawer located in the bedroom, was outside the scope of whatever authorization the defendant initially provided. *See State v. Malone*, 39,996, p. 6 (La. App. 2 Cir. 9/23/05), 912 So.2d 394, 398 ("any search beyond the permitted intrusion invalidates the voluntariness of the consent given to the extent that the search exceeds the parameters for which the permission was granted.").[5] For these reasons, the state's argument that the defendant's consent for Officer Paciullo to enter the residence to retrieve his cigarettes constituted valid consent for her subsequent entry into the residence, search of the dresser drawer, and seizure of the firearm, is without factual and legal support.

---

[5] Considering the above discussion, it does not seem that an objectively reasonable person would understand that defendant's consent to Officer Paciullo's request to get his cigarettes for him "would entail a wide scope of consent," to subsequently enter any room inside the residence at any time and look through dresser drawers, notwithstanding the state's assertion to the contrary.

The state also argued at the hearing that even if the firearm were unconstitutionally seized, the evidence should not be suppressed as a consequence of the illegal search and seizure because the officers would have inevitably discovered the evidence by lawful means. Notably, the inevitable discovery doctrine is not an exception to the warrant requirement and does not justify a warrantless search or seizure; rather, it is an exception to the exclusionary rule, which pre-supposes a Fourth Amendment violation for which the suppression of evidence is a contemplated remedy. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

The "core rationale" for excluding evidence that is the fruit of unlawful police conduct is "to deter police from violations of constitutional and statutory protections." *Nix*, 467 U.S. at 442-43. However, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means…then the deterrence rationale has so little basis that the evidence should be received." *Id.*, 467 U.S. at 444, 104 S.Ct. at 2509.

> The inevitable discovery doctrine "is in reality an extrapolation from the independent source doctrine: Because the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray v. United States*, 487 U.S. 533, 539, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988). A functional similarity exists between the independent source and inevitable discovery doctrines because both seek to avoid excluding evidence the police "would have obtained ... if no misconduct had taken place." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). The State therefore bears the burden of proving by a preponderance of the evidence that "the information ultimately or inevitably would have been discovered by lawful means...." *Id.*; *State v. Vigne*, 01–2940 (La. 6/21/02), 820 So.2d 533, 539. Application of

16

> the inevitable discovery doctrine thus "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment...." *Nix v. Williams*, 467 U.S. at 444, 104 S.Ct. at 2509 n. 5; *State v. Vigne*, 820 So.2d at 539.

*State v. Lee*, 2005-2098, pp. 22-23 (La. 1/16/08), 976 So.2d 109, 127.

For example, in *Nix*, the defendant, having already obtained counsel, was being transported by police to another jurisdiction and they were driving by an area the police suspected he had disposed of his victim's body. Without asking questions *per se*, the officers convinced the defendant to lead them to the body. This led the police to call off the massive community search that was underway, when the searchers had been relatively close to the body's location. 467 U.S. at 435-36, 104 S.Ct. at 2504-05. While the Court found that the police had illegally elicited the inculpatory information from the defendant because he had not waived his right to silence and did not have counsel present, the Court held that absent any unlawful police activity, the search party would not have been called off and would have inevitably found the body by lawful means. *Id.* 449-50.

In *State v. Flores*, 2010-0960, pp. 1-2 (La. 6/18/10), 37 So.3d 997, 998, police entered a residence without a warrant or consent to conduct a security sweep and secure the premises while obtaining a search warrant. In the process, defendant consented to the search, and so the police halted the warrant application process. *Id.* While the defendant's consent to search was apparently found to have been "tainted by its close temporal proximity to the entry of the officers," the Supreme Court nevertheless held the evidence admissible notwithstanding the initial illegal entry, as "the warrant process was well underway, and the application was 'pretty much typed and…ready to print,'" when the process was terminated by defendant's consent. *Id.* at p. 2, 37 So.3d at 998. Further, "nothing the officers

17

observed on the premises after their initial entry affected the decision to obtain a warrant, and [] the probable cause basis for the warrant application derived not from their observations on the scene but from [a confidential informant]." *Id*. Thus, the record was clear that the officers *would* have obtained a valid warrant and have inevitably discovered the contraband by lawful means. *Id*.

The Louisiana Supreme Court discussed the inevitable discovery doctrine in *Lee, supra*, at pp. 23-24, 976 So.2d at 127-28:

> Integral to the proper application of the inevitable discovery doctrine is a finding that law enforcement *would* have inevitably secured the evidence by lawful means, not simply that they *could* have. Thus, a mere showing that the police had probable cause for a search and could have secured a warrant from a neutral magistrate does not satisfy the doctrine, because it would effectively obviate the Fourth Amendment preference for warrants and reduce the exclusionary rule to cases in which the police lack probable cause. See *United States v. Elder,* 466 F.3d 1090, 1091 (7th Cir.2006) ("The usual understanding of that doctrine is that the exclusionary rule should not be applied when all the steps required to obtain a valid warrant have been taken before the premature search occurs [citing *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)].... If probable cause alone—without putting in train the process of applying for a warrant—were enough to invoke the inevitable-discovery doctrine, that would have the same effect as limiting the exclusionary rule to searches conducted without probable cause."); see also 6 LaFave, *Search and Seizure,* § 11.4, at 278–79 (Fourth Ed.) ("Circumstances justifying application of the 'inevitable discovery' rule are most likely to be present if these [independent] investigative procedures were already in progress prior to the discovery via illegal means, as in *Nix v. Williams,* or where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later.").

(Emphasis in original.)

18

In the instant case, the state failed to point to any alternative lawful means that had been set in motion that would have made the discovery (and seizure) of the firearm "inevitable," nor were any discussed in Officer Paciullo's testimony. At no point did the officers apply for a warrant, nor begin to apply for a warrant; in fact, Officer Paciullo testified that she *could* have, but chose not to. Nothing in the record before this Court supports the theory that the police would have inevitably accessed the firearm by lawful means. As discussed above, that the police *could* have obtained a search warrant is insufficient for the state to meet its burden of proving admissibility under the inevitable discovery doctrine. Consequently, we find that the prosecution failed to carry its burden in establishing the admissibility of the firearm that was unconstitutionally seized in this case.

## CONCLUSION

For the reasons aforementioned, we find that the trial court erred when it denied the defendant's motion to suppress evidence. Accordingly, the defendant's writ is **GRANTED**, the judgment of the trial court is **REVERSED**, the motion to suppress is **GRANTED,** and the matter is **REMANDED** for further proceedings.


**WRIT GRANTED; REVERSED AND REMANDED**